IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR MCCALL,<br><br>     Petitioner,<br><br>  vs.<br><br>DAVID BAUGHMAN, Acting Warden,<br>California State Prison-Sacramento,[1]<br><br>     Respondent. | No. 2:16-cv-0329-JKS<br><br>MEMORANDUM DECISION |

Arthur McCall, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254.  McCall is in the custody of the California

Department of Corrections and Rehabilitation and incarcerated at California State Prison-

Sacramento.  Respondent has answered, and McCall has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On January 28, 2011, McCall was charged with the murder of Jonah Simms.  The felony

complaint also alleged that McCall used and intentionally and personally discharged a firearm

and proximately caused great bodily injury or death.  It further alleged that McCall committed

the offense for the benefit of, at the direction of, or in association with a criminal street gang

with the specific intent to promote, further, and assist in criminal conduct by gang members.

McCall pleaded not guilty and denied the allegations.  On November 8, 2011, McCall proceeded

---

[1]  David Baughman, Acting Warden, California State Prison-Sacramento, is
substituted for Jeffrey Beard, former Secretary, California Department of Corrections and
Rehabilitation.  FED. R. CIV. P. 25(c); Rule 2(a), Rules Governing Section 2254 Cases in the
United States District Courts; *Stanley v. Cal. Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994).

to a jury trial.  On direct appeal of his conviction, the California Court of Appeal recounted the

following facts underlying the charge against McCall and the evidence presented at his trial:

### *Events Prior to the Shooting*

On November 21, 2008, Shaniece Hill drove her boyfriend, Jonah Simms (with whom she had just argued; and the victim here), and Simms's friend, David Loria (Loria), to a two-story apartment complex on Bowles Street in Sacramento, dropping them off around 8:00 or 9:00 p.m.

Once dropped off, Simms called a friend to retrieve him and Loria.  When the friend returned Simms's call for directions, she heard "Nigga, I'm just saying" in the background; the phone hung up, and no one answered when the friend made further calls.

Louanne Bower, a resident of the Cancun Apartments on Bowles Street, was returning to her apartment on the evening of November 21, 2008, when she saw several people outside the complex and defendant in the bushes outside the Cancun apartment of his girlfriend.

### *The Shooting*

Bower, about five or 10 minutes after she got inside her apartment, heard six or seven gunshots.  When Bower and her roommate went outside to see what happened, Toni Morgan (Morgan), [McCall's] girlfriend, called them over and asked them to hide some bullets for her.2 Bower and her roommate refused; Bower was on parole at the time.

Morgan admitted to law enforcement that, after the shooting, she got rid of some bullets in her apartment.  At trial, she testified she did not remember anything about the night of the shooting or about what she told law enforcement; at trial (in November 2011), she still considered herself [McCall's] girlfriend.  Detective Bryce Heinlein, the investigating officer in this case, testified that Morgan told him she first tried to give the bullets to a female apartment neighbor, who refused; then she put them under a nearby bush—the bullets were gold-colored, but she did not know the caliber.

Loria, the victim Simms's friend, testified that, at the time of the shooting, he and Simms were Nogales Gangster Crips.  As for the shooting, after the two of them were dropped off by Hill, Simms was on the phone until they reached the Cancun Apartments.  While on the phone, Simms was loud, mad and saying "cuz" a lot; "cuz" means "dude" in Crip lingo, but is offensive if spoken to a Blood gang member one does not know.  Loria knew the area was more Blood territory than Crips.

While Loria and Simms were walking, a man approached Loria with his hand in his pocket.  Loria touched the man's chest to get past.  After getting off the phone, Simms confronted the man; words were exchanged; and then the man shot Simms.  More than one shot was fired.  Loria was inconsistent regarding his description of the assailant and regarding his cooperation with the police; testifying for the defense at trial, he acknowledged testifying at the preliminary hearing that [McCall] was not the shooter.

Simms died of two gunshot wounds to the chest.  The bullets were copper-jacketed "[n]ominal .32 caliber," a caliber description that describes a whole family of cartridges that share the same basic bullet diameter.

### *The McCulloch Set of Witnesses*

Doris McCulloch (McCulloch) lived at the Cancun Apartments with her sons, Kenneth Rochelle (Rochelle) and Michael Wiley (Wiley), and her longtime boyfriend, Avery Kennedy (Kennedy).  McCulloch's daughter, Tashawana Wiley (Tashawana), also lived at the complex, in a different apartment, along with her boyfriend, Deandre Zachary (Zachary), and their child.

About a year after the shooting, during a police search in December 2009, Zachary was arrested on a drug sale charge, Wiley was arrested on an outstanding warrant, and Tashawana was cited for misdemeanor child endangerment.

After being arrested, Zachary told the police he had information about the November 21, 2008 homicide at the Cancun Apartments.  After Zachary informed Detective Heinlein that the officer really needed to talk to someone else, Heinlein questioned Rochelle.

During Detective Heinlein's initial questioning, the 16–year–old Rochelle was uncooperative and seemed dishonest.  Heinlein then had Zachary, who was 29 years old, join them and tell Rochelle it was okay to tell the truth.  Once Zachary was present, Rochelle explained to Heinlein that [McCall], on the night of the shooting, was outside the apartment complex when Rochelle arrived home.[FN3]  [McCall] told Rochelle that he had "got into it with somebody," and that he was waiting for them to walk past; when the two of them did, defendant followed them.  Just after [McCall] walked off into the parking lot and approached the two, Rochelle heard three or four gunshots.  With Zachary's prodding, Rochelle identified [McCall] from a photo lineup as the shooter, although he did not see the actual moment of firing.

> FN3.   Part of Detective Heinlein's interview of Rochelle, when Zachary was present, was recorded, transcribed, and played for the jury.

At trial, Rochelle claimed this account to Detective Heinlein was false, and that Zachary had pressured him to say this to protect Zachary's girlfriend and Rochelle's sister, Tashawana.

Wiley told Detective Heinlein, in a videotaped and transcribed interview played for the jury, that after he (Wiley) heard two gunshots, Rochelle returned to the McCulloch apartment and stated that [McCall] "just shot [a] dude" for bumping into [McCall] and saying "cuz."  Apparently, after the "cuz" statements, [McCall] went to his apartment, got a gun, and then shot the victim.  Wiley informed Heinlein that [McCall] was affiliated with the Oak Park Bloods.

At trial, Wiley testified that whatever he told law enforcement was just to help his sister, Tashawana, and that Zachary told him what lies to say.

3

Kennedy, McCulloch's boyfriend, told Detective Heinlein that, two days before the shooting, he bought some bullets for [McCall], and [McCall] gave him $20 for his efforts; Heinlein determined that Kennedy had purchased .32–caliber bullets.

The McCulloch set of witnesses—Rochelle, Wiley, and Kennedy—testified under a grant of use immunity.

### Gang Expert Testimony

A detective gang expert opined that [McCall] was a member of the Oak Park Bloods, that Simms was a member of the Nogales Gangster Crips, and that this homicide was committed for the benefit of the Oak Park Bloods.

*People v. McCall*, No. C071012, 2013 WL 4510572, at *1-3 (Cal. Ct. App. Aug. 23, 2013).

At the conclusion of trial, the jury found McCall guilty of first-degree murder and found true the firearm and gang enhancements. The trial court subsequently sentenced McCall to state prison for terms of 25 years to life for first-degree murder, an additional 25 years to life for the firearm enhancement, and an additional 10 years for the gang enhancement.

Through counsel, McCall appealed his conviction, arguing that: 1) the admission of Rochelle's videotaped interview violated his confrontation rights; 2) the admission of the interview violated his due process right to a fair trial; 3) the court erred by not holding a hearing to question whether jurors regarding an alleged statement by a juror that McCall was "guilty as sin;" 4) the trial court erred in denying the defense's motion for juror identifying information to investigate McCall's claim that the prosecutor wrongfully invoked sympathy and influenced the jury's deliberations by her conduct toward the victim's mother; 5) the trial court erred in imposing the 10-year term for the gang enhancement; and 6) there was insufficient evidence in the record to support that McCall had the ability to pay the main jail booking and classification fees. Respondent agreed that the 10-year sentence imposed for the gang enhancement should be stricken but other opposed the appeal. On August 23, 2013, the Court of Appeal issued an unpublished, reasoned opinion unanimously correcting the judgment to strike the 10-year gang

enhancement but otherwise affirming the judgment in all other respects. *McCall*, 2013 WL 4510572, at *7. McCall petitioned for review in the California Supreme Court, which was denied without comment on November 20, 2013. McCall's conviction became final on direct review 90 days later, when his time to file a petition for *certiorari* in the Supreme Court expired on February 20, 2014. *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

McCall then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on February 5, 2015. *See* 28 U.S.C. § 2244(d)(1)(A). McCall simultaneously filed a motion to stay the proceedings in federal court and hold them in abeyance to allow him to exhaust a fifth claim not raised in the instant petition. The Court, through an earlier-assigned magistrate judge, denied the request after determining that McCall did not demonstrate that he had diligently attempted to raise the improper sentencing claim to the state courts and the claim was not cognizable on federal habeas review in any event. The magistrate judge ordered Respondent to answer the exhausted claims. Briefing is now complete, and the exhausted claims are now before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, McCall raises four interrelated claims. First, he argues that the admission of Rochelle's videotaped interview violated his confrontation and due process rights because Zachary was present during the interview and "influenced the witness." He also contends that the court erred in failing to disclose juror-identifying information to allow the defense to investigate claims of juror and prosecutorial misconduct. McCall similarly alleges in Claim 3 that the trial erred in failing to conduct an inquiry of the jurors as to the juror and

5

prosecutorial misconduct claims.  Finally, McCall again argues in Claim 4 that the court erred in denying the defense's request for juror-identifying information.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

6

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and

application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536

U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned

decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).

IV. DISCUSSION

*Claim 1.*        <u>Violation of Due Process and Confrontation Rights</u>

McCall first argues that the court's admission into evidence of a videotaped interview

between Rochelle and law enforcement, in which Zachary also participated, violated McCall's

rights to confrontation and due process because Zachary did not testify at trial.  In considering

this claim on direct appeal, the Court of Appeal described the following facts underlying this

claim:

> As noted, Detective Heinlein testified at trial that the 16–year–old Rochelle was
> uncooperative—and Heinlein thought dishonest—during initial questioning.  The
> detective then had Zachary, who was 29 years old, join them and tell Rochelle it was
> okay to tell the truth.  In Rochelle's videotaped interview, Rochelle, with Zachary's

prodding, identified for Heinlein that [McCall] was the shooter (as set forth in the Factual Background of this opinion under the subheading, "The McCulloch Set of Witnesses ").

No statements from Zachary were admitted into evidence (given his unavailability at trial), except for (i) his communications during Rochelle's videotaped interview, and (ii) Detective Heinlein's testimony that Zachary told him he (Heinlein) really needed to talk to someone else (i.e., this statement from Zachary was admitted for the nonhearsay purpose of explaining what the police did next, which was to contact Rochelle).

*McCall*, 2013 WL 4510572, at *3.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant has the right to confront and cross-examine the witnesses against him. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). This generally means that out-of-court testimonial statements by a witness are not admissible against a defendant unless the witness is available for cross-examination at trial or the defendant had an opportunity to cross-examine the witness about the statements before trial. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). The Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'" *Id.* at 51 (citation omitted); *Davis v. Washington*, 547 U.S. 813, 823–24 (2006). "'Testimony,' in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51 (citation and some internal punctuation omitted); *Davis*, 547 U.S. at 824. As the *Davis* court explained:

> [a] critical portion of [Crawford's] holding ... is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

*Davis*, 547 U.S. at 821 (citation omitted). Thus, nontestimonial statements do not implicate the Confrontation Clause. *Giles v. California*, 554 U.S. 353, 376 (2008); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007).

Moreover, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9; *see also United States v. Wahchumwah*, 710 F.3d 862, 871 (9th Cir. 2013) (*Crawford* "applies only to testimonial hearsay, and 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" (citation omitted)). Furthermore, a Confrontation Clause violation is subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). A Confrontation Clause violation is harmless, and does not justify habeas relief, unless it had substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011).

The Court of Appeal considered and rejected McCall's confrontation and due process claims as follows:

### A. Confrontation Clause

. . . .

[McCall] contends that admitting into evidence Rochelle's videotaped interview denied defendant his right to confront Zachary in two ways: (1) this evidence conveyed to the jury that Zachary had also told Detective Heinlein that [McCall] killed Simms, via Heinlein confronting Rochelle with what Zachary had told Heinlein; and (2) [McCall] could not confront Zachary about his motivations for telling this story and pressuring Rochelle to match it.

With respect to [McCall's] first point, [McCall] notes from Rochelle's videotaped interview that "Rochelle looks at [Zachary] before identifying [McCall] as the person he encountered [while] at the apartment. Zachary is looking back and forth at Rochelle and then Detective Heinlein. Heinlein looks at Zachary and says what Rochelle is telling is different from what [Zachary] said. Zachary says, 'I know' and shakes his head. At various times, Zachary appears to be 'coaching' Rochelle."4

The quoted part above that most supports [McCall's] first point about not being allowed to confront Zachary's accusation against him is: "Heinlein looks at Zachary and says what Rochelle is telling is different from what [Zachary] said. Zachary says, 'I know' and shakes his head." However, the transcription of Rochelle's videotaped interview (a transcription the jury had) provides the following backdrop with respect to this interchange:

> "[ROCHELLE]: I was still on the [apartment] stairs [outside]. [McCall] walked
>     downstairs. [McCall] walked out the [apartment] back gate and . . . then I
>     heard pow, pow, pow, pow. [¶] . . . [¶]
> "[DET. HEINLEIN]: So you didn't walk out—
> "[ROCHELLE]: No.
> "[DET. HEINLEIN]: —down the street with [McCall]? Sure? 'Cause that's a
>     little different from what [Zachary] said.
> "[ZACHARY]: I know. I went in the house [i.e., inside his apartment]. I thought
>     [Rochelle] went—
> "[ROCHELLE]: [Zachary] wasn't—he was never outside."

Thus, the passage on which [McCall] most relies to claim he was denied the right to confront Zachary's accusation against him, actually lays waste to much of that argument. Zachary is uncovered, not as an independent accuser regarding the shooting, but as someone who did not know much of what occurred. Zachary was inside his apartment, tucked away from what was happening outside; instead of Zachary having "inside" knowledge, he had its opposite—"inside" ignorance. Furthermore, this interchange confirms Zachary's nonhearsay statement to Detective Heinlein that the detective really needed to talk to someone other than Zachary. As for Zachary's supposed "coaching" of Rochelle, such "coaching" does not appear in Rochelle's videotaped interview.

When we combine this analysis with the recognition that no other "testimonial" facts from Zachary were admitted into evidence, we conclude that [McCall's] first point lacks merit.

That brings us to [McCall's] second point regarding confrontation: He was denied the opportunity to confront Zachary about his motivations for telling a story and pressuring Rochelle to match it. But [McCall's] own words defeat this claim. In his opening brief, [McCall] states: "At trial, Rochelle testified that everything he told [Detective Heinlein] was a lie . . . . [¶] . . . [¶] Rochelle repeatedly testified that it was Zachary's idea to make up a story identifying [McCall] as the shooter to save Zachary and, more importantly, Zachary's girlfriend who was Rochelle's sister [Tashawana], from going to jail for the drug bust [in] December [2009]." Thus, Rochelle repeatedly disclosed Zachary's motivations; and, in any event, as we have seen, Zachary's own purported accusation against [McCall] had little or no basis in the evidence before the jury.

### B. Due Process

As [McCall] eventually concedes in his reply brief, his argument that Rochelle's videotaped interview violated [McCall's] due process right to a fair trial, rests on the foundation of the confrontation clause. Given that we just undercut that foundation, the related due process argument crumbles as well.

*McCall*, 2013 WL 4510572, at *3-5.

As an initial matter, McCall appears to argue that the entire interview with law enforcement should have been excluded due to the presence of Zachary, even though Rochelle testified at trial and was available for cross-examination.  But McCall has not, and cannot, point to any clearly established Supreme Court precedent that mandates that statements made by a witness who later testifies and is cross-examined must be excluded because of the presence of a non-testifying third party.

Moreover, the state court's treatment of Zachary's statements and actions was objectively reasonable.  As the state court reasonably determined, Zachary's statements were not testimonial because they were not used to establish the truth of the matters assertion.  Indeed, the only assertion he made served only to demonstrate that he, unlike Rochelle, did not have personal knowledge of the shooting.  Thus, his statements simply provided context as to why Rochelle was interviewed.

McCall also argues that, if Zachary had been available at trial, McCall could have confronted him about his motivations for telling a story that Zachary forced Rochelle to confirm.  But the Confrontation Clause concerns solely the basis for testimonial statements.  Here, Zachary's recitation of events was excluded, leaving only his non-testimonial statements and actions persuading Rochelle to "tell the truth."  Likewise, as the state court reasonably found, Rochelle repeatedly testified as to Zachary's motivations at trial and was cross-examined regarding Zachary's influence over the statements.  The state court's rejection of this argument was therefore neither contrary to, or an unreasonable application, of clearly-established Supreme Court precedent.

Furthermore, McCall cannot show that the admission of Zachary's comments had a substantial or injurious effect or influence on the jury's verdict.  As the state court explained, Zachary's comments did not explain Zachary's version of events, so McCall cannot show that they were useful to the jury in establishing guilt.  Indeed, it may have been that Zachary's comments benefitted McCall because they supported the defense's theory that Rochelle told law enforcement what Zachary, a person who wielded influence over Rochelle, told Rochelle to say.  Accordingly, McCall is not entitled to any relief with respect to the admission of McCall's statements.

*Claim 2-4.*     Juror Information Claims

The remainder of McCall's claims are related to the trial court's refusal to conduct or allow further investigations of the jurors into allegations of juror misconduct and prosecutorial misconduct.  Claims 2 and 3 argue that the trial court erred in failing to question the jury about a juror's alleged statement to another juror that McCall was "guilty as sin."  In Claim 4, McCall contends that the trial court should have disclosed juror-identifying information to enable the defense to investigate alleged prosecutorial misconduct by the prosecutor improperly comforting the victim's mother to invoke the jury's sympathy.  The Court of Appeal considered and rejected these claims on direct appeal as follows:

***A. Juror Misconduct***

[McCall] contends the trial court erred in failing to examine the jurors and alternates, after the verdict, as to what they knew about one juror supposedly telling another early in the trial that defendant was "guilty."  We disagree.

About two months after the verdict, [McCall] moved for the disclosure of sealed juror personal identifying information (i.e., juror contact information) to prepare a motion for new trial based on juror misconduct.  In support of the motion, [McCall's] mother declared that she overheard the "guilty" remark.

Initially, the trial court found that [McCall], based on his mother's declaration, had made a prima facie showing of good cause to release the sealed information, and

ordered that jurors be notified of the information request and given a chance to object. (See Code Civ. Proc., §§ 206, 237, subds. (b)-(d) [governing the process by which parties may seek juror contact information; disclosure requires good cause].)  When most of the jurors who responded to the notice objected to the release of their personal contact information, the trial court refused to release the information to the defense, but noted it was willing to set the matter for further hearing for the two jurors who had agreed to be interviewed.

[McCall] then moved the trial court to order all jurors to appear in court for court questioning.  The trial court denied the motion (eventually framed as a motion for new trial), finding that it would contravene the jurors' statutory privacy rights (Code Civ. Proc., §§ 206, 237), and that there was insufficient evidence of juror misconduct because [McCall's] mother's declaration lacked credibility; the court noted that the mother's declaration was inconsistent with her reaction of incredible surprise at the verdict and with conversations she had with [McCall] .  There was evidence that [McCall] and his mother had several (transcribed) jail phone conversations during the trial, but never mentioned any improper juror comment.  Furthermore, none of the several jurors who were contacted corroborated the "guilty" comment.

Relying on a decision from this court, *People v. Tuggles* (2009) 179 Cal. App. 4th 339 (*Tuggles*), [McCall] contends the trial court misunderstood its discretion to contact the jurors itself to investigate juror misconduct on its own, rather than having the parties do so.

In *Tuggles*, we observed, "[C]ode of Civil Procedure sections 206 and 237 allow jurors to prevent the release of [personal identifying] information to parties, their attorneys, investigators working for counsel, and members of the general public.  The court must heed the wishes of reluctant jurors to bar disclosure of [this] information to these persons.  However, Code of Civil Procedure sections 206 and 237 do not infringe upon the trial courts' inherent power to investigate strong indicia of juror misconduct. [Citation.]  Jurors may not thwart an investigation of misconduct by the court itself.  The trial court has discretion to subpoena even reluctant jurors when necessary to determine whether the factfinding process went awry.  [Citation.]  Accordingly, the [*Tuggles*] trial court . . . erred by concluding that it had no power to order jurors to attend an evidentiary hearing after they declined to discuss the case with counsel.  The duty to protect jurors from overzealous attorneys and investigators does not require an abdication of the court's obligation to ensure that the jury trial process is free from misconduct." (*Tuggles*, *supra*, 179 Cal. App. 4th at pp. 386–387.)

Based on these observations, we concluded in *Tuggles*, "Thus, where the trial court is presented with a credible prima facie showing that serious misconduct has occurred, the trial court may order jurors to appear at a hearing and to answer questions [from the court] about whether misconduct occurred." (*Tuggles*, *supra*,  179 Cal. App. 4th at pp. 385–386.)

Here, however, as the trial court implicitly concluded, [McCall] did not present it "with a credible prima facie showing that serious misconduct ha[d] occurred." (*Tuggles*, supra, 179 Cal. App. 4th at pp. 385–386.)  As the trial court noted, there was insufficient evidence of serious juror misconduct, given that [McCall's] mother's declaration lacked

credibility and not one of the several jurors who were contacted corroborated the "guilty" remark.

In two respects, [McCall] disputes a conclusion that the trial court properly refused to examine the jurors itself.  First, [McCall] notes the trial court did initially find that [McCall] had made a prima facie showing of juror misconduct, based on [McCall's] mother's declaration.  And, second, [McCall] argues that such a conclusion improperly mixes two different claims: (1) trial court error in denying a motion for new trial based on juror misconduct; and (2) trial court error in misunderstanding it had discretion to examine jurors itself to investigate the basis for a new trial motion grounded on juror misconduct.  Both of [McCall's] disputes, however, fall prey to the fact that [McCall] did not make the threshold showing required to trigger a trial court's examination of jurors: a credible prima facie showing that serious misconduct had occurred.

### B. Prosecutorial Misconduct

[McCall] also contends the trial court erred in denying his motion for juror contact information to investigate whether the prosecutor's conduct toward the victim's mother invoked sympathy, thereby improperly influencing the jury's deliberations.  According to [McCall], the prosecutor repeatedly exposed the jurors to the victim's mother by having the mother sit just outside the courtroom where the jurors congregated during breaks and by comforting the mother in front of the jurors by rubbing her shoulders and demonstrating her sympathy.

For two reasons, we conclude the trial court properly found that [McCall] failed to establish the requisite "good cause" for the release of juror contact information, pursuant to a motion defendant made about two months after the verdict. (Code Civ. Proc., § 237, subd. (b).)

First, to preserve a claim of prosecutorial misconduct for appeal, a defendant must have timely objected and requested the trial court to admonish the jury.  (*People v. Ayala* (2000) 23 Cal. 4th 225, 284.)  We realize [McCall's] contention here involves but a step on the way to establishing a claim of prosecutorial misconduct.  Nevertheless, had [McCall] timely objected to the prosecutor's alleged repeated exposures and requested the jury be admonished, this would have cured any harm at trial and we would not be entertaining this contention now.  Under the circumstances here, granting [McCall's] motion for juror contact information would allow a defendant to sit upon a claim of prosecutorial misconduct involving improper jury influence and then obtain juror contact information after an adverse verdict; this would allow the disclosure of such information through the back door, which could not be obtained through the front.

Second, the trial court instructed the jurors not to let sympathy influence their decisions; and to disregard anything they saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses.

*McCall*, 2013 WL 4510572, at *5-7.

A.    *Inquiry into alleged juror misconduct*

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors." *Irwin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir.1998).  "Although doubts regarding bias must be resolved against the juror, the defendants bear the burden of showing that the prospective juror was actually biased, and that the [trial] court abused its discretion or committed manifest error when it failed to excuse her for cause." *United States v. Maloney*, 699 F.3d 1130, 1135 (9th Cir. 2012) (internal citations, brackets, ellipses, and quotation marks omitted).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1997).

The United States Supreme Court has "long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *Remmer v. United States*, 347 U.S. 227, 228-29 (1954) (remanding case to district court to "hold a hearing to determine whether the incident complained of was harmful to the petitioner").  The record here reveals that the trial court solicited information from the jurors and held multiple hearings to determine whether further examination of the jurors was necessary or appropriate.  Although the trial court did not fully question each juror as to McCall's allegation, that fact does not compel the conclusion that an adequate inquiry was not made.  The United States Supreme Court does not require the partiality hearing to be conducted in a specific manner.  *Smith*, 455 U.S. at 217-18.  The Ninth Circuit has applied the *Smith* hearing requirement to a variety of situations and concluded that "[a]s long the

15

fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness." *Hedlund v. Ryan*, 750 F.3d 793, 807 (9th Cir. 2014) (citing *Dyer*, 151 F.3d at 974-75).

Based on a review of the record, the Court finds that the trial court's handling of the allegations of juror bias was reasonable and in accordance with clearly established federal law. The trial court's fact finding process was "objective and reasonably explored the issues presented [and, therefore,] the state trial judge's findings based on that investigation are entitled to a presumption of correctness." *Hedlund*, 750 F.3d at 807.  Because there was no competent evidence to demonstrate that any jurors were in fact biased, the trial judge was not required to undertake additional inquiry.  Indeed, it is noteworthy that McCall's mother indicated that she overheard the "guilty as sin" statement on the second or third day of the trial, but the issue was not raised to the trial court until roughly two months after the verdicts were rendered.  Because McCall was given an opportunity to establish actual bias and the trial court's factual determinations were reasonable, the appellate court's decision to deny McCall's request for further inquiry was not contrary to, and did not involve an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of fact.  McCall is therefore not entitled to relief on this ground.

B.    *Prosecutorial misconduct*

McCall also complains that the trial court did not disclose juror information to enable the defense to investigate whether jurors were unduly influenced by the prosecutor's conduct in comforting the victim's mother in an alleged attempt to invoke the jury's sympathy.  This claim is also without merit.  As an initial matter, because the state appellate court found McCall's

claim forfeited under California's contemporaneous objection rule, the claim is procedurally defaulted from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004). Because the state appellate court held that the claim was thereby forfeited under California's contemporaneous objection rule, the claim may be deemed procedurally defaulted on federal habeas review.

Moreover, as the Court of Appeal acknowledged, the trial court "instructed the jurors not to let sympathy influence their decisions; and to disregard anything they saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses." *McCall*, 2013 WL 4510572, at *5-7. This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis v. Franklin*, 471 U.S. 307, 323-24 & n.9 (1985) (discussing the subject in depth). Because McCall does not present any evidence that the jury was influenced by the prosecutor's alleged conduct, McCall's claim fails.

V. CONCLUSION AND ORDER

McCall is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: January 13, 2017.

  /s/James K. Singleton, Jr.  
JAMES K. SINGLETON, JR.  
Senior United States District Judge

18